Good morning, Your Honors. May it please the Court. My name is Andrea Bierstein. I represent the plaintiffs' appellants in all eight of the cases here. I'd like to reserve five minutes of my time for rebuttal. I understand I need to watch the clock myself and hopefully figure out when we're there. There are a number of issues in this case, as the Court is no doubt aware. With the Court's what I would start with is the issue of the defendant's duty to disclose the omissions part of the case. And I think this is central to the case, and I think it's also a place where there's been a fair amount of confusion, because the defendants insist that we've been unclear or vague about what it was that they didn't disclose. And so I want to clear up any confusion about that. And I think the place to look for what we're alleging they didn't disclose is in the complaints. And in particular, because the complaints on this point are essentially similar, the place in the record that I'm looking at is the excerpts of record. It's pages 240 and 241. This is from the Shea complaint. And in particular, in paragraphs 25 through 28, and then in paragraph 31, and specifically with these paragraphs allege, and this is what we say was omitted, these paragraphs allege that beginning in 2004, defendants implemented a scheme to increase the number of houses sold and to increase the amount of profit per sale. And that what they did in order to accomplish their scheme was to market to and finance unqualified buyers. They financed them with subprime loans who posed an abnormally high risk of foreclosure in order to both increase the number of sales and the price of the houses in the neighborhoods that they were also selling to traditionally qualified buyers. And one of the things we allege in there, we allege that defendants correctly anticipated that this would create a buying frenzy that artificially increased demand and house prices, resulting in increased profits to the defendants. Can I ask you this? Sure. Let's say that the defendants were not the originators of the mortgages, right? They were just in the business of selling the houses. But they knew, became aware somehow, that boy a lot of the people buying our houses are these subprime borrowers, right? The folks that you say posed a risk to the neighborhood as a whole. Would they have a duty to disclose that fact? Well, I think, Your Honor, and I think it depends on some specifics in there, because here we are saying that they were aware of it even in the loans that they didn't originate. But we do say that they're assisting in it and encouraging it. They're teaching the buyers how to fill out the applications in such a way as to qualify. Just focus on the duty to disclose. Well, I think, but I think Forget about the facts of this case. Just think of a totally new case, right? Because we're trying to figure out what's the sort of trajectory of California real estate law here. And so if we were to rule in your favor here, what would stop the next court from having to say, boy, yeah, a defendant would have a duty to disclose if it knew of the presence in the neighborhood of undesirable homebuyers? Well, I think, Your Honor, that there is an issue of the extent of their unique knowledge. How do they know? Here we know how they know. But the issue is when the defendant has, when the seller has information that's not equally available to the buyers. Now, in the world where they have nothing to do with this, they're not helping fill out the applications, they're not encouraging it, if they truly have nothing to do with it, there is an issue about how do they know and how do they know that it's different in a way that is not equally available to everyone. Here, we have unique knowledge. Do you agree that there is no California case that expressly deals with your contention here in terms of the duty to disclose? Well, I think it depends, Your Honor. I agree that there's no case with these facts. But I think the problem is the Reed case. And I want to focus on that in particular because Reed, although Reed has the particular facts about the gruesome murder that occurred there, but the law... I'm going to say that deals with a very unique situation which has since been picked up by statute. And there's an express requirement by statute to disclose that. And I think there's a statute that prohibits disclosure about people who died of AIDS and things like that. But aside from that, California law expressly deals with a duty to disclose what the owner, developer knows about that house, that neighborhood. And I'm looking for any case law that you can give to me, us, where there is a duty to disclose about the neighborhood. Well, Your Honor, I think there are cases, and I'm going to get to them in just a minute. But first, what I wanted to say about Reed that I think is important is the reasoning of Reed. Because in Reed, the court said, and this is quoted on page 36 of our opening brief, that the duty, the court specifically held that the duty does not turn on the character of the information. It's a functional test. The test is whether it affects the value and desirability. The court said if you've alleged, and in our case we've not only alleged the value and desirability, it's not the place of the court to go behind that because it doesn't turn on the character of the information. But turning to your point about the neighborhood. With respect though, Reed talks about murders that occurred in a house. And there was a sale of that house. You're not talking about that here. You're talking about an allegation that the sellers knew, or should have known, that in the neighborhood overall that they had built, that they knew that the people who were buying there simply weren't going to be able to continue to live there and they would have a whole bunch of foreclosures. To me, that's not, I don't know of any precedent in California law that goes that far. And so my question to you is, do you agree with that? Well, Your Honor, what I would say is California law explicitly goes beyond a specific house. And in several ways. First of all... That's just for exception. You're talking about murder and, you know, death by lethal. In the Shapiro and Alexander cases, both of those cases involved neighbors. Alexander was obnoxious neighbors. They weren't just noisy. They were parking too many cars on their property. They were pouring motor oil on their roof. And in the course of the opinion, the court specifically says there'd be a duty to disclose that. It wasn't this house. It was a different house. Under California law, there's a requirement for a seller to fill out a form that tells all of that. But that's a specific statutory requirement that every realtor or every seller knows. Here you're talking about whole subdivisions where, for the most part, nobody's there yet. You know, you're selling these homes and you're suggesting that rather than neighbors, homes, et cetera, you're talking about an ability on the part of these developers to somehow divine what individuals are going to do in the future with respect to their financial circumstances. And if we did that, where does it stop? How could anybody afford to develop and sell a home if you know that if a certain percentage of the people in your development have hard times or, for example, if the Colorado River loses enough water that people can't live there anymore, you're going to be responsible? Your Honor, in this case, we allege that they were, that this wasn't simply they couldn't predict the future of people's behavior. This was their scheme. And what they didn't disclose was their scheme. It isn't merely that they didn't disclose their subprime borrowers. They didn't disclose their own conduct. This is what we're doing. Their scheme was to intentionally sell to people that they knew or should have known would have had their properties foreclosed on and the neighborhood would go to hell. Well, they knew that they were going to intentionally sell to people who could not qualify for loans and we further allege that a high concentration of subprime borrowers inevitably inflates prices. This is separate from the foreclosures claim and this was something that this Court recognized the first time we were up here on appeal. Part of our claim is not what happened later with the foreclosures. Part of our claim is that we overpaid for the houses at the time. How do you deal with the lengthy disclosures that your clients individually or the class signed in which the developers expressly disclaimed any responsibility for the very kinds of things you're talking about? Those very disclosures, Your Honor, specifically represented things like it is builder's policy to provide homeownership opportunities to people who intend to purchase and occupy the homes as their principal residence. This policy is meant to discourage home purchase speculation and to encourage a stable community of owner-occupied homes. And it goes on to say that they make no representations that will continue to be the case and that they have no control over it, right? But our allegation is that there was no such policy and that once you're claiming you have a policy, similarly, they disclose that you had to submit documentation to them in order for them to determine whether it's likely you would qualify to buy your house. So once you're going to say we're looking at financials to see if you qualify, we have an anti-speculation policy in place because we don't want to sell to speculators. We want a stable community. We think that if, in fact, what you have is a scheme to inflate prices and volume by driving up demand artificially to create an artificial market, then you're obligated to disclose that because you've made these representations and, yes, they said we can't be sure that some investors won't buy, but our contention is there was no policy. There was a policy that was the opposite of that and that that's what they were obligated to disclose. And, yes, they said we can sell to anyone we want and we can change the terms, but in the meantime, the disclosures they did make, we have these policies in place and we're looking to see if you qualify, that those created an impression that was misleading in the absence of further disclosure. And I think that's particular to the Reliance. I think that it creates a misleading impression in the absence of further disclosure, which is we're selling houses to anyone who can sign on the dotted line because the bigger the market, the higher the prices go and the more houses we can sell. And had they disclosed that, then our clients would have understood that the value of their house was being inflated by this artificial market. I want to make one more point about the neighboring properties issue and the statutory disclosures in California because I think this is important. When California, when the legislature passed the statutory disclosures, the legislative history says that it's not meant to change the existing duty to disclose material facts and how did they describe that nuisances or other conditions of nearby properties that may affect the value or desirability of the property offered for sale. That's the duty they weren't changing. Are you suggesting that it was the conditions of the properties that were involved here? I thought you were talking about the financing of the properties. That's a very different issue. I don't know what legislative history is you're talking about. Where did that come from? This is, it's actually cited in our brief, Your Honor, at page 38. It's the legislative history for California Civil Code 2079, which is the statute on disclosure that we understand doesn't apply in our case, but in there the court was saying The legislative history of something that doesn't apply is relevant here. Because the court said, the legislature said we're not changing the existing common law duty. And that's the duty that is relevant. That's what we're suing on. So the legislature says nothing in this statute is meant to alter the duty to disclose the existence of nuisance or other conditions of nearby properties. We do think that this is a nuisance or other condition of a nearby property. It's the whole development. And I think, and I think what's interesting about Reed, the other point I would say about Reed, Your Honor, is that the legislature changed the specifics of the Reed holding about the murder. They didn't change the overall holding. They looked at the Reed case. And the Reed case says, doesn't depend on the character of the information. All that matters is value and desirability. If you plead that, that's enough. And what did the legislature say it needed to fix? The one thing it needed to fix was, well, it shouldn't be murders more than three years old. Maybe it shouldn't be someone with AIDS. They looked at that case and they didn't think, doesn't turn on the character of the information. Boy, that's broad. They didn't change that. Here's my problem with this case. It's a tricky one because many, much of what you say makes good, quite good sense. The defendants are trying to sell houses. They make representations designed to make buyers think that this is going to be largely owner occupied, going to be stable, going to be residential, that the value of their investment will remain intact and probably be increased. Got that. But your argument that you're focusing on is not this representation, although you do make that argument. The argument you're focusing on is failure to disclose. Well, that failure to disclose might not have made much difference. Hard to tell. There were a lot of people at this time who thought that this bubble was going to go on for a long time. Maybe you didn't even understand that there was a bubble, possibly even including your clients. They expected maybe the prices are going to continue to rise. And I'm having trouble, along with my colleagues, figuring out at what point do we have a duty to disclose when it's far from clear what the consequence of this selling practice is going to be and what the prices are going to be. Now, of course, we now know what happened. But I'm not sure that at the time they knew what happened or what would happen or when it was going to happen. Well, Your Honor, I'm down to my five minutes, but I want to answer this question. I think two things about this. I think that the California courts, in Reed in particular, in setting up the test, if the question is where do you draw the line, the California courts have said if it affects the value and desirability of the property, you have to disclose it. And I'm not sure that it's the place of this Court to limit the scope of the duty that the California courts and the California legislature have not chosen to limit. Reed said that in 1983. The legislature's had a long time to think about whether that language, that it matters, is it affects the value and desirability, and they haven't in 30 years thought that they needed to change that, and the courts haven't changed it. I got it. Let's hear from the other side, and then you've got some time. Sure. May it please the Court. William Donovan on behalf of the appellees. Obviously, the focus of your questions has been the duty issue. We had planned to split time with my able colleague taking the issues other than duty and statute limitations, the puffery issues, the specific disclosures. 50-50? Yes, please. But certainly subject to your questions, and I'm going to directly address what I think the concerns have been that all three of you have raised. Counsel for the plaintiffs has been unable to identify any California statute, rule, regulation, or case law at any time in the history of this great State to require the disclosures that they seek to make from the defendants in this case. None exist. She's been able to identify general principles contained in the California case law that make perfect sense that if there's something about the property or about the surrounding properties that any buyer would wish to know because it will affect the price, there's a duty to disclose. Your Honor, the I disagree with my colleague about that, but perhaps you can talk about the difference between individual houses and neighborhoods. Absolutely. To try to address both points, Judge Fletcher, the only two instances that counsel was able to identify are a nuisance, which is codified in statute, and the Reed case of murder codified in statute. So despite the assertion that somehow any material point that could be interesting to anybody needs to be disclosed, the legislature in its wisdom has never held ever that there about the financial condition of neighbors, which, as Judge Watford's question anticipated, could change. In this case, there's no allegation, nor could there be, that the defendants or their mortgage arms handled all the mortgages for these properties. There's no allegation made by the plaintiffs, nor could there be, that this was a static market where people had the right on the day after they closed to refinance their mortgages and enter into new terms that the defendants wouldn't know about. There's been a lot of criticism on the plaintiff's side for defendants entering into entirely lawful agreements. They suggest that 10% down now is the criteria. So if you give more 10% or more, you're qualified. Less than 10%, you're not qualified. They make that statement with the benefit of hindsight, even though the class period in this case is 2004 to 2006, and until 2012, they were telling the district court that, in fact, 20% down was a relevant criteria. So the argument they're making and the endless liability that I think the panel's anticipated is the idea that on a retroactive basis, with nothing rooted in statute, without a single court decision or legislative act to support the privacy right issues that are implicated here and the unlimited liability that companies like the defendants here would face, that needs to be imposed retroactive when they can't decide who really should get the disclosures and what the disclosures should mean. The other point that is really worth emphasizing is they are asking the defendants, in essence, to besmirch their own customers. Veterans are entitled to get loans that have less than 10% down. Congress has made the decision, particularly back then, that home buying should be a right in this country. Everybody should get a home. You know, I'll pick up on the word besmirch. You must have used it in the district court. The district court uses it in her order. I don't view it as a besmirching. It is what exists exists. The allegation is that your clients were selling to a lot of buyers who, on the odds, many of them were not going to be able to make payments. Okay. We're not naming the individuals. I mean, we're not talking libel suit. We're talking about what's the financing arrangement and what is the more or less predictable consequence of the financing arrangements. And, again, what we're submitting, Your Honor, is there are many reasons why that's not accurate. Number one, they can't decide what the appropriate standard is many years after the events in question. They say that any mortgage where a veteran purchased a home needs to be disclosed. There's no evidence, there's no allegation that somehow veterans are in worse shape to make payments than anybody else. Their argument presupposes that you may, for strategic or other reasons, have put 99999% down on your home. You could have $5 million in the bank. The home could cost $200,000. They're calling you unqualified. It doesn't make any sense. They've got this moving standard where they're trying to impose, again, an unlimited and changing commitment on these defendants and do it on a retroactive basis. The other fact that's worth mentioning is the plaintiff, Lumalu. No one wishes that he declared bankruptcy, but they cherry-picked as a name plaintiff someone who they deemed as creditworthy, someone who they thought was qualified, and someone who should have been the recipient of disclosures about his neighbors. In fact, they're wrong. Again, they didn't have to pick the plaintiff to 2009, but they were wrong. Let me ask you this just about the duty. Do you concede that there would be neighborhood-wide conditions that a home seller like your clients would know about that would need to be disclosed to the purchaser of an individual property, even though it might not directly affect the four corners of that property? Your Honor, not as it relates to the financial condition of folks in the neighborhood. If it's a nuisance, potentially, and that's in statute, I'd agree with you on that point. But, again, as your first question in this argument anticipated, the defendants don't know the terms of many of the mortgages that people in their neighborhoods have. Our clients are also committed to these neighborhoods. All these developments are built in phases. The idea that somehow they would be trying to get people in these homes who couldn't afford the mortgages and then they'd create chaos would hurt them financially as well. So there's a false premise to their entire case. Well, you carve out the financial condition of the occupiers of the other homes. Let's just put that aside. Just think of any other context. I'm just trying to get a sense of where you say the line has to be drawn. Is it your position that if there were some physical condition of other properties in the neighborhood that it didn't directly affect the purchaser of this home, but given that the home values of everybody in the neighborhood are going to be tied together to some extent, hey, they might want to know that 50 percent of the homes in this neighborhood are going to be subject to some problem that's going to arise later that you know about that they don't, and it's going to drive down their home price. One of my responses is that the legislature has set forth certain requirements in a regulated industry as to what needs to be disclosed in these home purchase contracts. In response to the Reid case that they keep talking about, the attorney general came to the conclusion that if there was going to be a licensed care facility in the neighborhood, that didn't need to be disclosed and shouldn't be disclosed. So there were certainly circumstances in which even the government has taken the position that there is no duty to disclose because they weighed the interests of people who needed to use the facility and thought that that disclosure might in fact not be supporting a greater good or greater interest that the state was trying to promote. Well, following up on Judge Wofford's question, is my understanding correct that the Department of Real Estate of California requires a very bulky disclosure by your client and all the other defendants here that lists in great detail any and all potential nuisances, high-tension power lines, traffic, schools, anything that might be remotely relevant to the neighborhood at large, and that these must be given to each and every buyer. They have to be signed for. That the legislature, as an effect, they haven't preempted it, but they have certainly blanketed the field with disclosures and information about the neighborhood at large. Your Honor, that's correct. The legislature has made the decision as to what should be disclosed. Our clients comply with that obligation. For privacy reasons, for the inability to give updated, accurate information, the district court was very practical in her decision in noting that after our clients sold the first house, it would be very difficult, if not impossible, for them to know who exactly within their neighborhoods had what financing arrangements and to make disclosures that would be proper and appropriate. I'd like to touch on it if we've exhausted the duty issue. If not, I'll answer, obviously, whatever the panel wants to ask. I want to quickly talk about the statute of limitations issue. They raised an Erie issue before Your Honors, but did not raise one at the district court. At the district court, their argument was the California discovery rule applies. We complied with it. We went. So the Erie argument is not properly before you, and we would urge Your Honors not to address that argument or at least adopt that argument. It's also wrong on the merits. The O'Connor case that's been around for a significant period of time makes clear that the discovery rule is not an affirmative defense, and a plaintiff must allege and prove when and how they discovered the information and give some explanation as to why it took longer than they would hope. Clearly, the complaints that were filed below did not meet the O'Connor standard. And Your Honor, for Judge Smith, in the Chubb v. Morrell case that you issued last year after the briefing was completed in our case, that decision makes absolutely clear you can make that determination on a motion to dismiss, and in fact that the California discovery rule is the operative standard. So we think there's nothing there. What am I missing on the statute of limitations front in this sense? I guess I thought that that didn't really carry the day for you, because unless you were able to persuade us that on the merits they're going to have to lose anyway, they'd at least get leave to amend to try to comply with the standard you're articulating, right? Your Honor, there's a reason why I started with a duty argument. But what I'd say is this. This is not a typical case where, as they would suggest, they had no idea what the law was or where the district court was going. They had three different opportunities to put forward the best complaint they could. In response to each of those three complaints, we filed motions to dismiss that raise the statute of limitations argument. The O'Connor case is not new. And the Erie argument they're trying to make is new, which is improper. Let me understand the Erie argument. I just looked in the index. I couldn't find Erie anywhere. They're trying to make a substantive versus procedural argument as whether federal law or California state law should apply to the discovery rule argument. I'm calling it Erie for shorthand. But the argument is it was in essence waived at the district court anyway. Judge Wofford, to get back to your point, they had three complaints. They had opportunities to respond to three different motions making the arguments that we did. They had at least two sets of arguments at the district court to make whatever arguments they did. And in either of their briefs to this circuit or this morning in argument, has counsel articulated any way in which they could meet the standards set forth in O'Connor and Chubb? I mean, I'll telegraph where I am. I'm having trouble finding a California cause of action on the merits that sustains the plaintiff's case. But I'm also having trouble accepting your statute of limitations defense. It's an affirmative defense ordinarily under either California or federal law. It has to be pled and proved. Unless the statute of limitations problem is apparent from the face of the complaint and there's simply no way around it, it's got to be pled and proved by you. Your Honor, I'm going to quit while I'm ahead based upon what you just said and yield the floor unless there are any other questions. Thank you very much. Good morning, Your Honor. It's Nathaniel Garrett for the defendants. I'm going to stay far away from arguing eerie with a former civ pro professor and focus mostly on the policies. But there are actually three things I want to just clean up very quickly that have happened so far. One is what you just talked about, Judge Fletcher, about it being an affirmative defense. I just want to give two citations that are contrary to that. One is West v. Great Western Power Company, 36 Cal. App. 2nd. 403. And it discusses how, in fact, even under 338D, the assumption is that the injury occurred at the time of the fraud and it's the plaintiff's burden to pled and prove the discovery rule. And the other is Samuels v. Mix, which is a more recent California Supreme Court opinion and very helpful about how 338 works in the pled and prove.  I'm sorry. Samuels v. Mix is 22 Cal. 4th. 1. The two things I want to hit really quick on duty, I perked my ears up, Judge Watford, when you used the word trajectory of California law because I think that's significant here. We're talking mostly about cases like Lynch and Reed, which are 1967, 1983. The trajectory of California law is that after Reed, you start seeing a lot of legislative activity. 2079, which is the main disclosure statute, was 1985. And it's not to say that the common law has been preempted or foreclosed. Of course not. But what you do see is a lot of legislative activity about saying, look, we want to be more specific about what these disclosure obligations are. And, in fact, 2079 itself was a response to a case called Easton and the legislature saying we want to sort of be much more clear about what disclosure obligations are because we're worried it's getting a little vague. And so, as Judge Smith said, you have things like the Subdivided Lands Act, which are pages and pages of disclosures about the community, about, you know, the soils in the community or what's going on nearby. So there's no doubt there's disclosures about the community. They're just very specific and very, you know, it's an ex ante issue where you know what you have to disclose and if you don't, you're in trouble. The second duty issue I wanted to hit, Judge Fletcher, is just you sort of read back in part the plaintiff's argument about what the duty standard is, and it wasn't actually complete. So I just want to be sure we're clear about what the duty standard actually is under the common law. It's number one that the seller knows of facts that are material and also knows that those facts are not within the diligent reach of the observation and attention of the buyer. So you see cases like Lynch that actually say, well, if this is something that the plaintiff, you know, could come forward and figure out, like if you were advertising the fact that you're selling to people with less than 10 percent down, that's not a duty of disclosure. And the other sort of tack on, which I think gets lost a little bit in the shuffle, comes from Reid itself where it talks about, you know, it's not like every material thing you have to disclose. You consider a couple of factors, and a couple of those really do strike here. One of them is sort of comparing the fairness of putting the duty of investigation on the buyer versus the duty of disclosure on the seller. I mean, obviously, if you walk into a house, you're going to have no idea if somebody was murdered in there. I do submit it's a different situation when builders and mortgagers across the country are advertising different mortgage products. It's not quite the same level of unfairness to say the buyer should, if that's something that matters to them, they should ask the builder or look around and see what are the kind of terms that are being offered. And the other, which I think is really significant. Can I just stop you? So you're saying that it was just a matter of, I guess, public knowledge that your clients were, I don't know, selling 50, 70 percent of the homes to subprime borrowers? Well, again, I'm limited to the complaint. But what we do know is that what they're complaining about, I mean, I think it's actually a misuse of the word subprime, but what they're complaining about is loans of 10 percent or less. But if that's the shorthand we're using, what they say is they allege that more than half of our loans were for that and that we were marketing those loans. I guess I'm just saying just based on those allegations, that's a very different situation than, you know, somebody being murdered in a house and it being cleaned up and you walk in and you have no idea what's going on. Because it's so rare in part. No, no, I mean, why? Because they could go investigate the title records to figure out what the terms of the mortgage were? Well, I don't think it's a matter of title records. I mean, if a mortgage entity is saying, here are the kinds of terms we offer. We offer FHA loans, which are, you know, for well more than 90 percent of a loan. We offer veterans loans, which are more than 10 percent. What I'm saying is there's not a good explanation in the complaint. No facts allege as to why the fact that we were offering loans of more than 90 percent was unknowable to the plaintiff. Would it have been unlawful or a breach of California law if your client or any of the other defendants had, say, in 2004 or 2005 when the market was hot, been able to say, you know, boy, people that have bought here, these prices have been just increasing like crazy. And we've got these hundred people who have resold their homes or they've refinanced and they've made so much money. Would that have been lawful under California law? To disclose that? Yeah. I don't know. I don't know, frankly. I mean, it – It's kind of the other end of the coin, is it not? I mean, you've got a situation where there's this big bubble, as Judge Fletcher pointed out, nationally. Yeah. And people are just diving in as much as they can to make money. You have people who are buying hundreds of homes, say, in Arizona. It was a very common problem to turn around and market them because it was going up so fast. Here you have a national situation, government encouraging it, everybody encouraging it, the banks, everybody encouraging it. And then you have the bubble burst. Right. So it's a question of allocating responsibility. And I guess my question is, if you're going to get dinged for this side of it, would you have any benefit on the other side? Would it have been a breach or a failure to disclose all the money that people had made? No, I don't think it would have been a breach if we hadn't disclosed it. I don't think we were obligated by law to disclose it either way. I mean, at that point, it's up to the builders. As a point of fact, none of these builders make representations about what the value of your home is going to do for obvious reasons. Is it not because there are real estate regulations that forbid them from doing so? There may be. I just want to say very briefly about the sort of just filed a reliance issue. I'm ready to admit that in most cases that's a fact issue, but this is a very unusual case for this reason. Judge Phillips found that there were no oral representations, at least none that meet 9B, that cajoled them into these agreements. So everything we're talking about in terms of misrepresentations are in the agreement. So you can actually look at them. Not a single defendant represented in these agreements were only selling to people 90% or more. Not a single defendant said we're only going to sell to owner-occupiers. We will not permit investors. Not a single one said that. The way Plaintiff's Counsel describes it, I think it's accurate, is an impression. They got an impression. So I think the question is – Wait a minute. You're talking only about the agreements that were actually signed, but there was literature that was handed out. There were – Did they all come to one side? Well, no, but the marketing materials, we sort of tied the materials together with certain representations. We haven't heard much about the sort of stable, family-based, which are the ones tied to the marketing materials. I was talking about the investor-owner-occupier, which is much more the focus of the briefs. Aren't all marketing materials subject to review by the Department of Real Estate? I think they are. Nobody can get them out at your level without providing those DRE approval. Right. And to be clear, there's no allegation that any of the lending practices themselves were wrong. What this is all about is we read these contracts and materials, and we got a certain impression. And my only point – and my time is up, so I'll stop – but my only point is that this is a case where you can look at justifiable compliance as a matter of law because all you have to do is look at the agreements, read them as a whole instead of cherry-pick little parts out of them to realize that what the builders were saying is we're not representing to you about the kind of people we're selling to, on the terms we're selling, the price we're selling, or what effect that's going to have on your house. And so it was appropriate for Judge Phillips to resolve that issue as a matter of law. Thank you. Thank you. I can't remember how much time was on the clock. I didn't ask for five minutes. I've got a lot to cover in five minutes. Well, you've got three minutes, 25 seconds, and let's start talking and see what happens. Okay. Well, I want to start – I want to bracket everything I'm going to say with just a point that I think applies to most of this, which is this case was dismissed on a 12b6 motion with no factual development and no factual record. And as we play out the hypotheticals about what if this, what if that, without a factual record, I think it makes it difficult to be deciding this in the abstract. And I think that ties into the points I want to ding through quickly if I can. In terms of what they didn't disclose, we're alleging that what they didn't disclose was their own conduct. We're not talking about they didn't tell us they made veterans loans or they didn't tell us that some people only put down 8%. We're saying that what they didn't disclose was their overall scheme, their conduct, which was to drive up volume and prices by engaging in these aggressive lending practices and aggressive selling to people who were not qualified. It's much more general than this 10%, 20%, which I'm going to get to in a minute, but specifically it's their own conduct. And I think that's important for the concerns the Court has about other cases and how far does this go. If there's anything the defendant can be required to disclose, it's its own conduct, if it affects the value and desirability of the neighborhood it's buying. The 10% down, 20% down, those have never been part of our allegations about what had to be disclosed. Those were our class definitions, which we changed at one point. Defendants have always assumed that every buyer is either in the plane of class or what they would call part of the problem. That is not necessarily the case. The class definition does not necessarily dovetail precisely. Who are the people that they had to disclose? Who are the buyers? Well, as I said, what they didn't disclose was their own practices and the extent of the subprime. Well, subprime lending has a specific meaning in the real estate industry, and the fact that they were aggressively engaging in subprime lending, and they were not only doing subprime lending, they were helping. This is in the complaint. They were assisting borrowers in kind of fudging or lying on their application, sort of teaching them how to fill it out to make it look as if they would be qualified. It was a whole series of practices that went beyond, you know, what percentage people were putting down. It went beyond subprime lending. It went to the extent and how they implemented it. X percentage of our buyers have a credit score below X? Is that what you're saying? Well, again, I think that some factual development would help us here, but what we've alleged is a scheme that, and as I say, we tick off in the complaint about eight different ways that they were manipulating to make it look as if the buyers were qualified. And so it's the manipulation to make it look as if, you know, even people – these people didn't even necessarily qualify for that if the seller is helping you manipulate the application to look like you're qualified when maybe you're not even qualified for that. So, I mean, what we're alleging is this whole scheme that was not disclosed. Now, in terms of whether California statutory law has somehow superseded this or blanketed that, I mean, again, I just want to emphasize that the legislature specifically said when they passed the disclosures that it was not intended to affect the common law duty. And that's, as I say, it's quoted in – the specific language is quoted in our brief. They were – the fact that they have blanketed it with statutory requirements, they said we are not altering existing common law duties. Yeah. No, we got that. Okay. If I can just – on the statute of limitations, I'm going to be really brief on that. I think the Von Sacher case from this Court, 2010 – You've got that in your brief. Okay, fine. Don't need to touch on that. On the leave to replead, they've talked about the three complaints. There have been no prior rulings from the Court. Judge Phillips herself said she would have given us leave to replead on the other points. Last point on justifiable reliance, I just want to emphasize what we're saying, the defendants misrepresented on which we justifiably relied. They said we have a policy about anti-speculation. They didn't have a policy. They said we're – We got that, too. Okay. Then I think – okay. Okay. Thank you very much. Thank you for your very helpful arguments. Thank you very much. Kelly v. These are homes that all submitted for decision. And that completes our calendar for this morning.
judges: Fletcher, Smith, Watford